### *In re* HAMMOND'S WILL.

*(Surrogate's Court, New York County.* May 7, 1888.)

1. WILL—REVOCATION.

A will offered for probate had been drafted by one S., and B. was one of the subscribing witnesses. Contestants of the will sought to show the execution of a subsequent will; and two witnesses, one of whom was interested in defeating the contested will, testified that the testator had read or stated to them the provisions of a will which varied somewhat from the terms of the contested will. They also testified that the alleged subsequent will was written by S., and that one of the subscribing witnesses was B. Both S. and B. testified that they had been concerned with but one will. B. was a disinterested witness. *Held,* that the execution of a subsequent will was not shown.

2. SAME.

The provisions of a will cannot be defeated by subsequent oral declarations of the testator that he did not understand their effect.

On contest of will.

*Frederick W. Crocker,* for proponent. *A. Oldwin Salter* and *Rhoderick F. Farrell,* special guardians, for contestants.

RANSOM, S. The paper offered in this proceeding was executed in accordance with the requirements of the statute on the 16th of August, 1882. By its provisions the decedent bequeathed to her daughter, Mrs. Hough, her personal estate, and directed that her real estate be sold, and one-third of the proceeds be given to Mrs. Hough, and the other two-thirds be divided between five grandchildren, one of whom is the daughter of Mrs. Hough, and two the children of one, and two the children of another, deceased son. Objections were filed by the husband of the decedent and by the special guardian of one child of a deceased son, the other grandchild having died since the execution of the will. The husband subsequently withdrew his objections. The two subscribing witnesses were neighbors of the decedent, Mr. Byrnes and Mr. Mead, who were called in at noon-time, as they were going to their homes to dine, and to whom she produced the will. It was not read by her nor to her at the time of its execution, and the effort of the contestant has been to prove that the decedent could not read writing, and that she could not write except her signature. Testimony was introduced showing declarations by her to that effect, and that she had often asked others to read letters for her; and counsel claim that there is no trustworthy evidence that she knew the contents of the paper. Against this proof evidence was adduced showing that 30 years since, when she kept a small store, she made charges in her books against customers, and that in recent years she produced letters that she had received, and which she read to others. It is doubtless true that, if she could read writing, her ability in that direction was very indifferent. But the draughtsman of the will, Mr. Smith, testified that he received the instructions therefor from the decedent, which he noted on slips of paper, and afterwards read them to her, and then incorporated the language in the instrument, which was written on an ordinary printed blank, and was read to her when completed. The contestant has sought to discredit his testimony by showing that he had been an inmate of the house in which the decedent and Mrs. Hough, her daughter, the principal legatee, resided, for several years, and was on such intimate and friendly terms with the daughter that he was interested in shaping his testimony to advance her personal interests. But I see no reason, in view of corroborating proofs, which should cause me to discredit his statements in this regard. The contestant also claims that the decedent not only did not understand that the provision bequeathing her personal property to Mrs. Hough included some $2,000 in bank, but that the instrument had been revoked by the execution of a subsequent will. To maintain this last contention they produced Mrs. Bowers, a niece of the decedent, who testified that in April or May, 1887, the decedent produced to her a paper purporting to be a

will, and which, at the decedent's request, she read to her, and that the instrument in dispute is not the one. She recited the provisions contained in the paper, and they only vary from the instrument offered in these particulars: That, instead of two-thirds of the proceeds realized from the sale of the real estate going to four grandchildren, three only were mentioned, (one of the children having died since the date of the will;) and that Mr. Alfred Hammond was named as the guardian of two children, Willie and Ella Green, (though their mother was alive;) and that the name of the father of two of the children, Joseph Elijah Green, was not contained in it, as it is in the paper in dispute. Mrs. Bowers did not state the date of the instrument she read, but she recollected that one of the subscribing witnesses was Mr. Byrnes, whom she knew as a neighbor of the decedent. The other name she did not recall. Mr. Byrnes had already stated in his testimony that he had only witnessed one will for the decedent. Mrs. Bowers says that when she read the clause that she bequeathed her personal property to Mrs. Hough, and called the decedent's attention to the fact that that included all her money in bank, the decedent said, "No;" that she supposed that when the property was sold the money would be divided; and Mrs. Bowers told her that the way she had it it was not so; and the decedent said that when she got well she was going to have things attended to, and that she didn't intend it should be that way; and that Mr. Alfred Hammond, who was named as the guardian, was the children's best friend; and that Mr. Smith had written the will. She further said that the decedent did not state that she had made no other paper, and that she never knew that decedent had made a will until that day; that decedent told her that the will was made just after she had recovered from her sickness, and before she went on a visit to New Baltimore. The subscribing witness Mr. Byrnes stated that the decedent told him that she was going to the country, and wanted things fixed. Maggie Connell, a girl employed in the family for seven years, and who was present at the time the will was executed, stated that the decedent went to New Baltimore twice after she became acquainted with her,—the first time a few days after she signed the will, and which she thinks was in 1882, and that she went the next year again. Smith, the draughtsman of the will, says that the decedent went to New Baltimore first in 1880 or 1881, and the next time one or two years after, and he thinks that two years intervened between the two visits. He also states that he never drew but one will for her. Mrs. Calver (the widow of one of the decedent's sons, who, since the death of her husband, has remarried) testified that on the 1st of August, 1887, the decedent said to her: "I may not see you again, and I will tell you how things are,"—and, without producing the will, she repeated the contents of her will substantially as stated by Mrs. Bowers, and, in addition, that she had named Mrs. Calver the guardian of her daughter Jennie, and told her that she had given Jennie a music-box. She further testified that the decedent told her that Smith wrote the will, and that Mr. Byrnes was a witness. She fixed the time when decedent went to New Baltimore as after the death of the decedent's grandchild, and which would be a period later than the date of the will. Against this statement, Maggie Connell testified that the decedent did not go to New Baltimore after the death of the grandchild, and she told Maggie that she never signed any other will. There are unexplained inconsistencies in the testimony, and it is evident that Mrs. Bowers' and Mrs. Calver's recollections must be at fault, or else that they have allowed personal feeling to warp their statements from the exact truth. The testimony of Mr. Byrnes, a disinterested witness, that he had signed but one will, must be credited. If it is, it is impossible that the paper that Mrs. Bowers read to the decedent could have varied from the provisions of the instrument offered in the manner she states. Mrs. Calver has the interest of her children at stake in endeavoring to set aside the will, for if the decedent shall be declared intestate they will be entitled, under the

statute of distributions, to a larger sum than they would take under the will.

As I must hold that the contestants have failed to prove the existence of a will subsequently executed, the only question remaining to be considered is that raised by the proof that the decedent did not understand one of its important provisions,—that by it the money in bank was a part of her personal estate, and as such would go to her daughter, Mrs. Hough. But the fact that Mrs. Bowers read the paper produced by the decedent, in 1877, containing the same dispositive provisions, and that the decedent in the same year repeated them substantially as contained in her will to Mrs. Calver, must remove any doubt that the decedent knew the contents of the instrument offered; and the claim that it did not express her testamentary wishes, in that she did not understand that the money in bank was to be included in the personal estate which was to go to her daughter, Mrs. Hough, cannot militate against the validity of a will drawn under her instructions, and properly executed. It is an elementary principle that a testamentary instrument cannot be revoked by parol, much less by subsequent declarations that its provisions were not understood by a testator. If the instrument did not express her wishes, it could have been revoked either by its destruction or mutilation, or by the execution of a subsequent will, or it could have been modified by a codicil. Neither of these methods was resorted to; hence the will must stand, and a decree may be prepared admitting it to probate.